# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA VASIL and CHRISTINE FARAG, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | No. 16-cv-9937 |
| v. | ) ) | Hon. |
| KIIP, INC., a Delaware corporation, | ) ) | |
| *Defendant*. | ) ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, Jessica Vasil and Christine Farag, bring this Class Action Complaint against Defendant, Kiip, Inc. ("Kiip" or "Defendant"), for secretly tracking cellphone users' private information without those users' consent. Plaintiffs allege as follows based on personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief, including an investigation by their attorneys.

### NATURE OF THE ACTION

1. Defendant Kiip is a mobile marketing company that displays advertisements on mobile devices through mobile applications, or "apps," installed on individuals' smartphones, including iPhones and Android devices. Reportedly reaching over 100 million consumers across a network of more than 5,000 apps, Defendant's advertising platform utilizes proprietary marketing technology to integrate with smart phone apps and seamlessly deliver ads to consumers.

2. Defendant created its advertising platform to allow app developers to monetize their apps through a wide variety of third-party advertisements that Defendant displays to the consumers

while they use such apps. Because Defendant's marketing platform integrates with the software of smart phone applications, Defendant gathers extensive information about consumers through their use of their cellphones, including personally sensitive information such as health statistics, purchasing activities, dietary profiles, and productivity goals, among other information.

3.      Defendant uses the information it collects to custom-tailor ads to specific groups of app users located throughout the country, including ads on behalf of clients such as Coca-Cola, Marriott, and Home Depot.

4.      However, in or about 2014, Defendant undertook a misguided effort to secretly extract information about smartphone users without their consent. Indeed, as part of an attempt to improve its marketing capabilities and tailor ads to consumers, Defendant began accessing consumers' personal information by tracking and intercepting millions of users' electronic communications without their knowledge or consent—even while those individuals' mobile devices were not in use.

5.      Not only did Defendant fail to inform consumers about its invasive monitoring activities, Defendant also kept its app developer partners in the dark about its unseemly and illegal conduct. Indeed, one such developer, Fitnesskeeper, Inc. ("Fitnesskeeper"), which operates the popular fitness app Runkeeper, terminated its relationship with Defendant and issued a public apology upon learning that Defendant was snooping on Runkeeper users by extracting their personal information and intercepting their electronic communications.[1]

6.      The data that Defendant collected from individuals' mobile devices without those individuals' consent included consumers' personally identifying information, their current

---

[1] Jason Jacobs, A Message to Our Users, Runkeeper Blog, http://blog.runkeeper.com/4714/a-message-to-our-users/ (last visited Oct. 12, 2016).

geographic location, and their individual cellphone device identifiers. Although this data was valuable to Defendant's marketing business, Defendant's conduct invaded consumers' privacy and violated consumers' statutory and privacy rights, resulting in actual, concrete harm to millions of individuals throughout the country.

7.      In addition to violating consumers' privacy rights, Defendant's conduct violated federal and state law, including the Federal Wiretap Act, 18 U.S.C. § 2510, et seq., and the Illinois Eavesdropping Statute, 720 ILCS 5/14-1, et seq.

8.      Accordingly, in order to redress these injuries, Plaintiffs bring this suit on their own behalf and on behalf of a nationwide class of similarly situated individuals, seeking an award of actual and statutory damages; injunctive relief prohibiting Defendant from monitoring, collecting, and transmitting consumers' information without their consent; equitable relief, including the disgorgement of any profits that Defendant derived from ill-gotten information; punitive damages; and reasonable attorneys' fees.

## PARTIES

9.      Plaintiff Vasil is a natural person and a citizen of the state of Illinois.

10.     Plaintiff Farag is a natural person and a citizen of the state of Illinois.

11.     Defendant Kiip is a Delaware corporation with its principal place of business in San Francisco, California. Kiip is registered to do business in Illinois where it maintains offices, and it conducts business in this District and elsewhere throughout the United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Plaintiffs' Federal Wiretap Act claims pursuant to 28 U.S.C. § 1331, because those claims arise under federal law. The Court may assert supplemental jurisdiction over Plaintiffs' state law claims pursuant to § 1367, because those

claims share a common nucleus of operative fact with Plaintiffs' Federal Wiretap Act claims, such that they form part of the same case or controversy under Article III of the United States Constitution.

13.     The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are greater than 100 putative class members; and at least one putative class member is a citizen of a state other than Defendant's states of citizenship.

14.     This Court may assert personal jurisdiction over Defendant, because Defendant is registered to do business in Illinois and does business in this District, and because Defendant committed certain acts in this District that have given rise to the claims at issue in this case, as Defendant extracted personal data from Plaintiffs' cellphone communications while Plaintiffs and their phones were present in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b), because Defendant resides in this District; Defendant conducts business in this District and maintains an office in this District; and because a substantial part of the events concerning the conduct at issue occurred in this District, as Defendant intercepted Plaintiffs' electronic communications while Plaintiffs and their cellphones were present in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### *Background on Mobile Advertising*

16.     Software applications on mobile devices have created new challenges to consumer privacy. Many apps collect vast amounts of personal data and use intelligent tracking technologies to record user information, including individuals' interests, preferences, location, and health,

among many other subjects.

17.     Apps and their integrated technology also frequently track individuals' usage behavior, such as the length and frequency of an individual's use of an app, which allows companies to connect usage information with a specific customer account to build a profile of an individual user.

18.     App users are often unaware of the threats to their privacy rights, because apps and the companies that develop them often fail to fully disclose the types and extent of data collected. Nonetheless, this data is extremely valuable—not just to businesses, but also to advertising companies such as Defendant.

19.     Although mobile app companies collect user information, in many cases user data is also gathered by third-party software or technology integrated into a mobile app. When a consumer downloads, installs, and uses a mobile app on a smart phone, she usually does not know whether the app contains third-party technology that will collect or receive information about the user and her use of the app. Rarely, if ever, are consumers' informed of the actual identity of such third-parties.

***Third-Party Tracking***

20.     Defendant provides a type of mobile advertising technology commonly referred to as a "third-party tracker." Third-party trackers like Defendant's monitor and record information about smartphone users, including how they use their smartphone and what their usage patterns are. They also collect more personal information, such as behavior patterns, interests, and data about the user's particular device.

21.     A third-party tracker is not by itself a software app. Rather it is integrated into an existing mobile application. Once integrated, the third-party tracker can passively receive and

actively extract data through the app, which is then sent to the tracker's advertising servers and is capable of being used to display ads to the app's user. (*See* Figure 1, below).



**(Figure 1)**

22.     Defendant and other third-party trackers use the information they collect to deliver advertisements and promotional offers based on user preferences, demographics, and geographic location, among other characteristics, and they often sell the information they collect to other companies. By design, third-party trackers, including Defendant's, gather extensive information in order to customize ads based on user preferences, behavior, and demographics, and they monetize aggregate user information by selling it to other third-parties.

23.     Defendant's advertisements promote large corporate brands, and they are typically marketed to consumers as "rewards" within a mobile app when it is in use. Defendant ordinarily receives payment from such brands whenever an app user accepts or redeems such a "reward," which money Defendant then shares with the developer of the app in which the ad appeared.

*Defendant's Integration with the Runkeeper App*

24.     At least as early as August 2014, Defendant partnered with Fitnesskeeper, the developer of the Runkeeper mobile app.

25.     Runkeeper is a popular fitness app with nearly 50 million users worldwide. Users initially must download the app to their smartphone or other mobile device. Once downloaded, the Runkeeper app allows its users to utilize their smartphones' geo-location capabilities to track how far and how fast they run during a workout. Runkeeper also allows users to save the routes they run and their best times on those routes in order to set goals for future runs or share their times with friends.

26.     Based on a user's recorded runs and use of the Runkeeper app, the app provides the user with challenges and suggested workouts, tailored to the user in accordance with information gathered through the app.

27.     Many of Runkeeper's functions rely heavily on the user's smartphone's geo-location tracking, as well as the user's health and fitness information gathered through the app.

28.     On August 14, 2014, Defendant publicly announced that it had partnered with Runkeeper to deliver advertisements within the Runkeeper app.[2] Defendant's ads contained offers and promotions for various products, and were designed to appear at the moment a user completed a challenge or beat their best run time, so as to make the user feel as though they were being rewarded. (*See, e.g.,* Figure 2, below).

---

[2]  Brittany Fleit, Runkeeper & Kiip Partner to Reward 34 Million Users, Kiip Blog, http://blog.kiip.me/advertising/runkeeper-kiip-partner/ (last visited Oct. 12, 2016).



**(Figure 2)**

29.     Defendant has described its integration with Runkeeper as follows:

[A]fter logging a workout and hitting various milestones (e.g., achieving a best new pace), users will be rewarded serendipitously. Rewards are fitness-related products. . . . "Runkeeper leverages Kiip's technology to give users the extra motivation to run faster or go the extra mile. By enabling brands to own millions of point-of-sweat moments, Kiip adds value to people's daily fitness routines through natural rewards."[3]

***Defendant's Advertising Platform Secretly Collects Users' Personal Data***

30.     As with the Runkeeper app, Defendant's technology is designed to recognize when app users complete a milestone or reach an achievement within the app, and seize on that opportunity to deliver a promotion or offer on behalf of one of Defendant's clients.

31.     Thus, by design, the defining feature of Defendant's marketing platform is its

---

[3] *Id.*

ability to monitor events in the lives of app users in real-time and detect when there will be a marketing opportunity for one of Defendant's clients. To determine when such an event has occurred and to deliver effective ads, Defendant partners with app developers like Fitnesskeeper to obtain continuous access to consumers' information and app usage activity.

32.     The ads that Defendant shows to app users are not random. Defendant custom-tailors rewards and matches its clients' ads with certain app users based on its clients' target audience and desired demographics.

33.     In order to determine whether its clients' products will appeal to certain app users, Defendant secretly collects and monitors users' personal information.

34.     For instance, through the Runkeeper app, Defendant extracted app users' current geographic locations and cellphone device identifiers and had access to other personal information—even when the app was not in use and, more importantly, when users were not even using their respective phones. However, Defendant  failed to obtain users' consent to do so.

35.     Defendant designed and programmed its technology to covertly monitor app users without their consent and without the consent of its app partners in an effort to gain further marketing information about such users. Such activity involved intercepting the contents of consumers' electronic communications between them and their cellular service providers and between users and app developers, such as Fitnesskeeper.

36.     Defendant also designed and programmed its marketing platform to integrate the information it obtained through covert means with the information it obtained overtly through its partnerships with app developers, like Fitnesskeeper, in order to build consumer marketing profiles. Defendant's marketing platform then transmitted the contents of the unauthorized user information to its servers for its own use.

37.    Defendant never obtained consent from any Runkeeper users before intercepting, monitoring, collecting, and transmitting their personal information. To the contrary, Defendant concealed its actual data collection policies from the public and its business partner apps, including Runkeeper, knowing that consumers would resist disclosing personal information when not using an app and when their phones are not in use.

***Government Inquiry Finds that Defendant's Technology Raises Privacy Concerns***

38.    On May 10, 2016, the Norwegian Consumer Council—a Norwegian government agency and consumer protection organization—filed a complaint regarding Defendant and Runkeeper with the Norwegian Data Protection Authority.

39.    The complaint was based on a study of privacy risks in mobile apps performed by SINTEF, an independent scientific and industrial research organization.[4] For the study, SINTEF analyzed 21 different popular mobile apps for smartphones to determine what personal information those apps were collecting and revealing about their users.

40.    Among the 21 mobile apps, the study focused on Runkeeper and a number of other fitness and sports apps due to the "vulnerability in fitness and sports apps as they often contain health-related data."[5] Specifically, the Norwegian Consumer Council determined that Runkeeper "generates extensive personal data, such as location in combination with time as well as information about the user's physical fitness, health and training habits."[6]

41.    SINTEF's study further found that much of this information is obtained by

---

[4] Antoine Pultier et al., SINTEF, Privacy in Mobile Apps: Measuring Privacy Risks in Mobile Apps (2016), *available at* http://www.academia.edu/22037218/Privacy_in_Mobile_Apps_Measuring_Privacy_Risks_in _Mobile_Apps.
[5] *Id.* at 12.
[6] Norwegian Consumer Council, Complaint Concerning the Mobile App Runkeeper 3 (2016), *available at* http://fbrno.climg.no/wp-content/uploads/2016/05/2016-05-10-Complaint-runkeeper-ENG.pdf (hereinafter "Consumer Council Complaint").

Defendant and similar third-party trackers, who "have access to important information about the phone and its user, such as the device identifier."[7]

42.     A device identifier is a serial-like identifier for a particular cellphone. Tracking companies such as Defendant use these device identifiers for marketing purposes. The use of these identifiers poses a greater risk than tracking technologies typically used on PC web browsers, because the numbers are difficult or impossible to delete and can be tied to other personal data.

43.     Most importantly, however, the SINTEF study found that the Runkeeper application, when integrated with Defendant's technology, "tracks the [user's] GPS position even when the phone is not in use." As a result, "The users can [] be geo-tracked whenever the [smartphone's] GPS function is turned on."

44.     This finding resulted from the testers' "48 hour analysis." For this phase of the testing, the testers installed Runkeeper on a smartphone and monitored the phone for 48 hours without ever actually using it. During this period, the testers did not unlock the phone's screen, meaning that the phone was idle and its screen was black. Even though the cellphone tested was not in use over the entire 48-hour period, the testers found that Defendant repeatedly collected information through the Runkeeper app.

45.     Based on its finding that "the [Runkeeper] app collects location data and other personal information when the mobile phone and app are not in use," the Norwegian Consumer Council found it problematic that "this personal data is transferred to a third party [Kiip] when the app is not in use."

46.     Defendant failed to obtain consent from the consumers whose information it collected. Because users were entirely unaware that their data was being extracted and transferred

---

[7] Pultier, *supra* note 4, at 13.

from their smartphone communications when the Runkeeper app was not in use—and even when the phone was not in use—there was a complete "lack of consent regarding the collection and sharing of location data . . . ."[8]

***Fitnesskeeper Ends its Relationship with Defendant and Apologizes to Consumers***

47.     Shortly after the Norwegian Consumer Council observed in its complaint that "we cannot see that the app at any point – in the app itself, in the terms of use, privacy policy or on its website – makes the user aware that location or other personal data is collected when the mobile phone is not in use or when the user is not involved in a training session, nor that this data is forwarded to a third party [i.e., Defendant],"[9] Fitnesskeeper terminated its relationship with Defendant's advertising service and formally apologized to consumers for Defendant's untoward conduct.

48.     On May 17, 2016, the founder and CEO of Runkeeper, Jason Jacobs, issued a written, public apology in response to the Norwegian Consumer Council's complaint and the SINTEF study.[10] His apology, posted on the Runkeeper website, refers to Defendant and states that users' location data was unexpectedly being extracted from consumers' cellphones and received by Defendant. Jacobs further stated that Runkeeper had decided to remove Kiip's technology from its app going forward.

***Allegations Specific to Plaintiffs***

49.     Plaintiffs downloaded and used the Runkeeper app on their smartphones while Defendant's third-party tracker was integrated with the app.

50.     During their use of the Runkeeper app, Plaintiffs' cellphones communicated with

---

[8] Consumer Council Complaint at 3.
[9] *Id.* at 4.
[10] Jason Jacobs, A Message to Our Users, Runkeeper Blog, http://blog.runkeeper.com/4714/a-message-to-our-users/ (last visited Oct. 12, 2016).

their cellular service providers and the Fitnesskeeper servers, providing their geo-location information and device identifiers to Runkeeper along with other personal information about themselves.

51. Defendant intercepted, collected, and received the personal information Plaintiffs provided through the Runkeeper app and stored it on their servers. However, Plaintiffs were unaware that Defendant's third-party tracker was integrated with the Runkeeper app and that it was intercepting their communications and collecting their information.

52. Plaintiffs were also unaware that Defendant's third-party tracker was intercepting their phones' electronic communications and collecting their personal information, including their geo-location and device identifiers, while they were not using the Runkeeper app, and even when they were not using their respective cellphones, because Defendant never informed them as such.

53. Plaintiffs never provided consent to Defendant to monitor, intercept, collect, and transmit their personal information while they were not using the Runkeeper app, and especially not when they were not using their respective cellphones.

54. Plaintiffs would never have downloaded or used Runkeeper had they known that Defendant would monitor, intercept, collect, and transmit their information when they were not using the Runkeeper app, and even while their respective cellphones were not in use.

**CLASS ALLEGATIONS**

55. Plaintiffs bring this action on their own behalf and on behalf of a nationwide class (the "Class") with a statewide subclass (the "Subclass") defined as follows:

> The Class: All people in the United States and its territories who used Runkeeper® on a mobile device during the applicable limitations period.
>
> The Subclass: All people who used Runkeeper® on a mobile device while in Illinois during the applicable limitations period.

56.     Excluded from the Class and Subclass are any members of the judiciary assigned to preside over this matter; any officer, director, or employee of Defendant; and any immediate family member of such officer, director, or employee.

57.     Upon information and belief, there are hundreds of thousands, if not millions, of members of the Class and Subclass, making the members of the Class and Subclass so numerous that joinder of all members is impracticable. Although the exact number of Class and Subclass members is unavailable to Plaintiffs, the members of the Class and Subclass can be easily identified through Defendant's records and/or Defendant's partners' records.

58.     Plaintiffs' claims are typical of the claims of the members of the Class and Subclass they seek to represent, because the factual and legal bases of Defendant's liability to Plaintiffs and the other members of the Class and Subclass are the same, and because Defendant's conduct has resulted in similar injuries to Plaintiffs and to all of the other members of the Class and Subclass. As alleged herein, Plaintiffs and the other members of the Class and Subclass they seek to represent have all suffered harm and an invasion of privacy as a result of Defendants' unlawful and wrongful conduct.

59.     There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class and Subclass, and those questions predominate over any questions that may affect individual members of the Class and Subclass. Common questions for the Class and Subclass members include, but are not limited to, the following:

(a)     Whether Defendant failed to obtain the Class and Subclass members' consent to intercept and extract personal information, including their location data, while the Runkeeper app was not in use on their respective mobile devices, including while their respective mobile devices were not in

use;

(b)     Whether Defendant's conduct violated the Federal Wiretap Act;

(c)     Whether Defendant's conduct violated the Illinois Eavesdropping Statute;

(d)     Whether Defendant was unjustly enriched by receipt of the Class and Subclass members' data.

60.     Absent a class action, most members of the Class and Subclass would find the cost of litigating their claims to be prohibitive, and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

61.     Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class and Subclass they seek to represent. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and Subclass and have the financial resources to do so. Neither of the Plaintiffs nor their counsel has any interest adverse to those of the other Class and Subclass members.

62.     Defendant has acted and failed to act on grounds generally applicable to the Plaintiffs and the other members of the Class and Subclass, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and Subclass and making injunctive or corresponding declaratory relief appropriate for the Class and Subclass as a whole.

## COUNT I
### Violation of the Federal Wiretap Act (18 U.S.C. § 2510, et seq.)
### on behalf of Plaintiffs and the members of the Class and Subclass

63.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

64.     The Federal Wiretap Act generally prohibits any person from intentionally intercepting or endeavoring to intercept any "wire, oral, or electronic communications." 18 U.S.C. § 2511(1).

65.     The cellphones of Plaintiffs and the Class and Subclass members transmitted data and information to Fitnesskeeper and their cellular service providers through the use of the Runkeeper app, constituting "electronic communications" under § 2510(12) of the Federal Wiretap Act. Defendant was not a party to these communications.

66.     By designing and programming its software to contemporaneously monitor, intercept, and transmit the contents of electronic communications that Plaintiffs' and the other Class and Subclass members' mobile devices sent to Fitnesskeeper and their respective cellular service providers, including communications containing their individual geo-location data and device identifiers, Defendant intentionally and knowingly intercepted and/or endeavored to intercept the contents of electronic communications in violation of § 2511(1)(a).

67.     Further, by automatically and contemporaneously transmitting Plaintiffs' and the Class and Subclass members' information to its servers and using that information to display advertisements, Defendant intentionally and knowingly used or endeavored to use the contents of such electronic communications while knowing or having reason to know that the data was obtained through the interception of an electronic communication in violation of § 2511(1)(d).

68.     Neither Plaintiffs nor the Class and Subclass members consented to Defendant's

interception or use of the contents of their electronic communications. Nor could they have consented—Defendant never sought to obtain Plaintiffs' consent nor that of the other Class and Subclass members, and each unlawful interception occurred without their knowledge and while they were not using the Runkeeper app, including while they were not even using their respective mobile devices.

69.     Plaintiffs and the other members of the Class and Subclass have suffered an invasion of privacy along with actual, concrete harm as a result of Defendant's violations of the Wiretap Act.

70.     Due to Defendant's unlawful conduct, Plaintiffs and the other Class and Subclass members are entitled to an award of actual or statutory damages, whichever is greater, pursuant to § 2520(c)(2); such preliminary and other equitable or declaratory relief as the Court deems appropriate pursuant to § 2520(b)(1); an award of punitive damages pursuant to § 2520(b)(2); and an award of reasonable attorneys' fees and other costs pursuant to § 2520(b)(3).

## COUNT II
### Violation of the Illinois Eavesdropping Statute (720 ILCS 5/14-1, et seq.)
### on behalf of Plaintiffs and the members of the Subclass

71.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

72.     A person violates the Illinois Eavesdropping Statute where he or she "knowingly and intentionally . . . [i]ntercepts, records, or transcribes, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication . . . ." 720 ILCS 5/14-2(a).

73.     The Illinois Eavesdropping Statute broadly defines "private electronic communication" to mean "any transfer of signs, signals, writing, images, sounds, data, or

intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(e).

74.     The mobile devices of Plaintiffs and the other Subclass members transmitted data and information to Fitnesskeeper and their cellular service providers through the use of the Runkeeper app, constituting "electronic communications" under Section 14-2(a) of the Illinois Eavesdropping Statute.

75.     By designing and programming its third-party tracker to contemporaneously monitor, intercept, record, and transfer the contents of electronic communications sent by the mobile devices of Plaintiffs and the other Subclass members, including their geo-location data and individual device identifiers, Defendant intentionally and knowingly intercepted and recorded "private electronic communications" in violation of Section 14-2 of the Illinois Eavesdropping Statute.

76.     Plaintiff and the other Subclass members intended and believed that the information they provided through the Runkeeper app would be private. Indeed, their usage information reveals sensitive details about their health and fitness levels; their geo-location information can be used to determine where they are physically present at any given time; and their device identifiers can be used to trace electronic communications to their respective mobile devices to determine their individual identities.

77.     Plaintiffs and the other Subclass members expected that such information would remain private and/or would not be transmitted to an unknown third-party entity like Defendant while they were not using the Runkeeper app, and especially when they were not even using their

- 18 -

mobile devices. Plaintiffs and the other Subclass members reasonably expected that such information would not be used or collected by unknown third-parties in ways that exceeded the scope of their consent.

78.     Defendant failed to notify or inform Plaintiffs and the other Subclass members that it was monitoring and intercepting their information and geo-location data while they were not using the Runkeeper app and while their mobile devices were inactive. Therefore, there was no reason for them to believe that anyone was accessing or intercepting their private electronic communications during times when they were not using the app or even using their mobile devices.

79.     Neither of the Plaintiffs nor any of the other members of the Subclass consented to Defendant's interception or use of their private electronic communications. Nor could they have consented—Defendant never sought to obtain consent from Plaintiffs or the other Subclass members, and each unlawful interception occurred without their knowledge and while they were not using the Runkeeper app, including while they were not even using their respective mobile devices.

80.     Due to Defendant's unlawful conduct, Plaintiffs and the other Subclass members are entitled to an award of actual damages pursuant to § 14-6(b); injunctive relief as the Court deems appropriate pursuant to § 14-6(a); and an award of punitive damages pursuant to § 14-6(c).

**COUNT III**
**Unjust Enrichment**
**on behalf of Plaintiffs and the members of the Class and Subclass**

81.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

82.     As explained above, Defendant monitored, collected, received, and transmitted the usage data and geo-location information of Plaintiffs' and the other members of the Class and Subclass without their knowledge or consent.

83.     To the extent that Defendant collected or received Plaintiffs' and the other Class and Subclass members' personal information and geo-location data, Defendant has retained a benefit to the detriment of Plaintiffs and the other Class and Subclass members. This benefit is measurable by the monetary value of the Plaintiffs' and the other Class and Subclass members' information. Defendant appreciates or has knowledge of such benefit.

84.     Further, to the extent that Defendant received advertising revenue as a result of information obtained improperly from Plaintiffs and the other members of the Class and Subclass, and/or to the extent that Defendant transmitted or sold Plaintiffs' and the other Class and Subclass members' information and geo-location data, in whole or in part, to a third-party, Defendant has retained a benefit to the detriment of Plaintiffs and the other Class and Subclass members. Defendant appreciates or has knowledge of such benefit, which is measurable by the revenue Defendant received.

85.     Because Plaintiffs and the other Class and Subclass members would never have downloaded and used the Runkeeper app had they known that such information would be improperly collected by third-parties like Defendant who were unauthorized to gather such information, Defendant has unjustly received and retained a benefit as a result of its conduct.

86.     As explained above, Defendant was not authorized and did not have consent to collect this information, and Defendant's retention of this benefit violates fundamental principles of justice, equity, and good conscience.

87. Defendant has been enriched, and it would be unjust to allow Defendant to retain the enrichment.

88. Plaintiffs are therefore entitled to an award of damages in the amount by which Defendant was unjustly enriched and an order requiring Defendant to disgorge any benefit it has retained.

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the other Class and Subclass members, pray for the following relief:

A.      an order certifying the proposed Class and Subclass as defined above and appointing Plaintiffs as the class representatives;

B.      an award of statutory damages under Count I;

C.      an award of actual damages under Counts I and II in an amount to be determined at trial;

D.      disgorgement or restitution under Count III in an amount to be determined at trial;

E.      such preliminary and other equitable or declaratory relief as the Court deems appropriate under Count I;

F.      injunctive relief under Count II;

G.      an award of punitive damages under Counts I and II;

H.      an award of reasonable attorneys' fees and other costs under Count I; and

I.      such other and further relief as the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: October 21, 2016                    Respectfully submitted,

                                           JESSICA VASIL and CHRISTINE
                                           FARAG, individually and on behalf of a

- 21 -

class of similarly situated individuals

By: /s/ *Paul T. Geske*
One of Plaintiffs' Attorneys

Myles McGuire
Evan M. Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

*Attorneys for Plaintiffs*